IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LEONARD J. PEREZ, Regional Director of the Fourteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>                Petitioner,<br><br>vs.<br><br>NOAH'S ARK PROCESSORS, LLC d/b/a WR RESERVE,<br><br>                Respondent. | 4:19-CV-3016<br><br><br>MEMORANDUM AND ORDER |

The Regional Director of the National Labor Relations Board has, on its behalf, petitioned pursuant to § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) (NLRA), to enjoin alleged unfair labor practices engaged in by the respondent, Noah's Ark Processors.[1] As explained below, the Court is at least partly persuaded that that the Board is likely to succeed on its claims that Noah's Ark has engaged in unfair labor practices, and that the remedial purposes of the NLRA would be frustrated unless some immediate action is taken pending the Board's administrative enforcement proceedings. Accordingly—although the Board will not get everything it asked for—the Court will grant the Board's petition.

---

[1] There was a change of ownership during the term of the previously operative collective bargaining agreement, and a change of name during the underlying events. *See* filing 14 at 37, 46. Neither party brings up any issue relating to the changes, so for the sake of simplicity the Court will refer to the respondent as "Noah's Ark" throughout.

## I. BACKGROUND

Noah's Ark is engaged in "the slaughter, processing, packaging and non-retail sale of meat products" in Hastings, Nebraska. Filing 1 at 3. It was party to a January 2013 collective bargaining agreement (CBA) with the United Food and Commercial Workers Union Local No. 293; that CBA expired on January 28, 2018. Filing 18-4 at 1-12.

Starting in November 2017, the Union requested information from Noah's Ark so it could prepare to negotiate a successor agreement to the expiring 2013 CBA. Filing 18-4 at 17-19. That request was renewed in December 2017 and repeatedly in January, February, and March 2018. Filing 18-4 at 20-37. The information was not provided. Filing 18-4 at 18-37.

At a supervisor-employee meeting in late 2017 or early 2018, the Noah's Ark operations manager told employees that the Union would be removed from the plant. Filing 15 at 77-78, 148. According to one employee, the workers asked for raises, and in responding the operations manager told them that "there's no union in the plant" and Noah's Ark would "get rid of [the Union]" because "they didn't allow them." Filing 15 at 19. According to another employee, the workers were told that raises could be given because of the Union's removal. Filing 15 at 149.

At the same time, the Union was trying to get Noah's Ark to actually engage in collective bargaining. *See* filing 18-4 at 20. The Union asked Noah's Ark for some dates to meet, but Noah's Ark did not respond. Filing 18-4 at 20-23. Eventually, Noah's Ark offered to meet with the Union in Perth Amboy, New Jersey. Filing 18-4 at 26. The Union suggested that Hastings, Nebraska would be better. Filing 18-4 at 26. Noah's Ark countered with negotiations in Grand Island, Nebraska and offered a number of dates in March 2018. Filing 18-4 at 28. The Union accepted any of the dates offered, "provided that [Noah's

Ark] provides the requested information in the near future as indicated." Filing 18-4 at 28. Eventually, they agreed to at least start in Grand Island on March 22. Filing 18-4 at 33. At that meeting, Noah's Ark simply received the Union's contract proposal and offered nothing of its own. Filing 18-4 at 37. For further negotiations, Noah's Ark offered April 25 and May 9. Filing 18-4 at 37. On March 28, 2018, the Union filed an NLRB charge based on Noah's Ark's failure to bargain in good faith with the Union. Filing 3 at 3-4.

Meanwhile, on March 27, 2018, a group of employees gathered in the cafeteria, intending to discuss with management the hiring of a new employee at a higher wage than more senior employees. Filing 14 at 258-60. A Noah's Ark superintendent was asked why some people were making more than others, and why raises hadn't been given. Filing 14 at 266. The superintendent replied that it was because of the Union contract. Filing 14 at 266.

The superintendent left, and returned after 15 minutes accompanied by the operations manager. Filing 15 at 269. The meeting had started before the employees' shift, but by this time they were scheduled to be at their stations. Filing 17 at 142-43. The operations manager told the employees that anyone who didn't want to work could go home. Filing 14 at 270. The employees left, but the operations manager told the superintendent to write down the names of some employees, because "[h]e didn't want those employees back into the building." Filing 14 at 270-71.

When the group reached the parking lot, they spoke with the plant manager, who told them that they should go back to their workstations and discuss the problem that day after work. They refused, explaining that if they "went in back to the building and worked that day, they would forget about the issue and [they] wouldn't have a solution to what [they] had asked for." Filing 14 at 275. In response, the plant manager told them that they could either go

back to work or leave the premises. Filing 17 at 96. They were told that if they didn't leave, police would be called. Filing 14 at 276; filing 17 at 98. Ten employees were fired. Filing 18-4 at 256-66; *see also* filing 15 at 150-52, 158-61, 167-72, 182-90.

At some point, the Noah's Ark human resources manager created a preprinted form for employees to sign if they wanted to withdraw from the Union and stop Union dues from being deducted from their pay. Filing 16 at 27-28. Some of the forms were only in English, while others were in English and Spanish. *See* filing 18-2 at 120-34; filing 18-4 at 132-80. About 60 signed forms were collected from employees between September 2017 and July 2018. Filing 16 at 27; filing 18-2 at 120-34; filing 18-4 at 132-80. However, each employee whose testimony about signing the form is cited by the Board explained that they had been provided with the form *after* they approached the Noah's Ark human resources manager and asked how to stop paying union dues. *See* filing 13 at 4; filing 15 at 49, 86, 126, 136-37, 202-03.[2]

Noah's Ark also prepared a form captioned, "Request for Nondisclosure of Confidential Employment Information." *See* filing 18-4 at 181-231. The form was written in English, and generally indicated that the signing employee did not want Noah's Ark to disclose "confidential information"—such as identification data and information about hiring, salary, performance, or benefits—to be disclosed without the employee's written consent. *See* filing 18-4 at 181. Noah's Ark collected about 50 signed forms. Filing 16 at 39. Dates on the forms varied, but they were mostly between early and mid-2018. *See* filing

---

[2] Another witness testified that she had seen the HR manager approach some other employees in their work area and provide them with some forms to sign. Filing 15 at 69-75. But those employees didn't testify, and there's nothing in the record about whether they had previously asked to withdraw from the Union or stop the dues checkoff.

18-4 at 181-231. The types of information listed on the nondisclosure form bear significant similarity to the information previously requested from Noah's Ark by the Union. *Compare* filing 18-4 at 17-19 *with* filing 18-4 at 181.

One employee, who could not read English, testified that he had signed the nondisclosure form after being told that it was necessary to complete his removal from the Union. Filing 15 at 88-91. That employee had previously authorized providing his information to the Union, and it's not clear from the record whether he understood the effect of signing the subsequent form. *See* filing 15 at 88-96. Two other employees who had left the Union identified their signatures on the forms, but didn't remember signing them. Filing 15 at 126-27, 203-04. And one of them also said that because the form was in English, she didn't know what it said. Filing 15 at 204.

The parties finally met again on May 15, 2018, and Noah's Ark did offer a written proposal. Filing 18-4 at 341. And in June 2018, the parties settled the NLRB bad-faith bargaining charge pursuant to a settlement agreement that required Noah's Ark to provide the Union with the information it had requested and hold bargaining sessions "no less than 24 hours per month for at least six hours per session, or in the alternative, on any another schedule to which the Union agrees." Filing 18-4 at 122-25.

On July 13, Noah's Ark provided information for 15 employees. Filing 18-4 at 274-91. The information on even those 15 employees appears to be incomplete, and as far as the record indicates, no other information has been provided on any of the other employees potentially in the bargaining unit.[3] Eventually, information obtained from Noah's Ark by the Board revealed that

---

[3] The record reflects differing estimates on the size of the bargaining unit, but it appears to be somewhere between 250-350 workers.

Noah's Ark had unilaterally raised employee wages, without discussing them with the Union. *See* filing 17 at 47-48; filing 18-1 at 176-178.

The Union returned to the NLRB with a July 23 charge, alleging among other things that Noah's Ark had refused to bargain in good faith and had engaged in various unlawful anti-Union activities. Filing 3 at 6-7. Additional charges, and amended charges, were filed in August, September, November, and December 2018, and February 2019. Filing 3 at 8-24. Those charges, as consolidated, form the basis of the underlying administrative proceeding. Filing 3 at 25-37.

As part of its investigation, the Board issued subpoenas to a number of Noah's Ark employees. *See, e.g.*, filing 18-2 at 19. Interviews with the subpoenaed employees were scheduled for November 7, 2019. *See* filing 18-2 at 19; filing 18-3 at 11. In late October, Noah's Ark retained Kutak Rock, LLP to provide legal counsel to the subpoenaed employees. Filing 18-3 at 1-13. A "Notice to Employees" was provided—in English and Spanish—informing employees that they might be contacted by the Board, that they had the right to have legal counsel when speaking to the Board, and that they could contact the Kutak Rock attorneys that Noah's Ark would pay for "as a benefit to our employees." Filing 18-4 at 253-55.

Although the notice said that employees were "not required or compelled to report to or consult with [Noah's Ark] regarding obtaining legal counsel," at least one employee testified that he had been told by a plant manager that he "needed a company attorney" and that it was "mandatory" to speak with "the company attorney." Filing 15 at 53-54; filing 18-4 at 253. Other employees reported simply being sent to the office, where counsel was waiting to speak to them. Filing 15 at 128-29, 139-40. One employee also reported that after the

interview, the plant manager questioned him about what the NLRB agent had asked. Filing 15 at 58-60.

In the meantime, the parties had been engaged in "negotiations." The parties met on July 13, but unlike previous meetings at which Noah's Ark had been represented by its legal counsel, Noah's Ark was now represented by "Administrative Clerk Mary Junker." Filing 18-4 at 341. According to the Union's representative, before the meeting even started, Junker said something to the effect of, "I don't know why I am here. I don't know why they sent me. I can't make any decisions." Filing 17 at 28. At the next session, on July 27, Junker was accompanied by a plant manager, but he only observed. Filing 17 at 29. Junker appeared alone at the next two meetings, on August 17 and 22. Filing 18-4 at 341. Junker testified that she was not authorized to agree to the Union's proposals; instead, her function was to bring the Union's proposals back to ownership. Filing 14 at 67.

At the August 17 meeting, the parties did agree on a few aspects of the Union's initial March 22 proposal: they agreed to move certain language from the management rights provision of the CBA to the seniority provision, they agreed to clarify that "benefits" meant health benefits, and they agreed to update the anti-discrimination provisions of the CBA. Filing 14 at 81. Junker did not have answers, at that meeting, to the modified written proposal the Union had provided on July 27. Filing 14 at 82; *see* filing 18-4 at 341. But at an August 30 meeting, Noah's Ark rejected that proposal. Filing 18-4 at 343.

After that, the parties settled into a cycle of "negotiation": the Union would offer a proposal, and then at the next meeting (usually a week later) Noah's Ark would reject that proposal, but make no counterproposal. *See* filing 18-4 at 343-44; *see also* filing 14 at 87. Junker was the sole representative for Noah's Ark at each meeting. *See* filing 18-4 at 343-44. Noah's Ark rejected five

more Union proposals this way, until the January 2, 2019 meeting at which Noah's Ark finally offered another proposal: its "Best and Final Proposal." Filing 18-4 at 81, 343-44.

The Best and Final Proposal did not include the matters on which the parties had previously agreed on August 17, 2017, and did not say anything about wages. Filing 18-4 at 81-83; *see* filing 17 at 40-46; *see also* filing 18-4 at 7-8. At a final meeting on January 25, 2019, the Union's representative asked several questions about the Best and Final Proposal; Junker answered and the meeting adjourned. Filing 17 at 49. No deadline to respond to the Best and Final Proposal was expressed. Filing 17 at 45, 47, 49. Nonetheless, on January 30, Noah's Ark declared an impasse and unilaterally implemented the Best and Final Proposal. Filing 14 at 97-98; filing 18-4 at 84, 117.

## II. DISCUSSION

Section 10(j) of the NLRA authorizes the Board to seek, and the Court to grant, "such temporary relief or restraining order as it deems just and proper" pending disposition of the Board's administrative proceedings. First enacted in 1947, § 10(j) is a limited exception to the federal policy against labor injunctions. *Sharp v. Parents in Cmty. Action, Inc.*, 172 F.3d 1034, 1037 (8th Cir. 1999). Section 10(j) is reserved for a more serious and extraordinary set of circumstances where the unfair labor practices, unless contained, would have an adverse and deleterious effect on the rights of the aggrieved party which could not be remedied through the normal NLRB channels. *Minnesota Min. & Mfg. Co. v. Meter for & on Behalf of NLRB*, 385 F.2d 265, 270 (8th Cir. 1967); *see Sharp*, 172 F.3d at 1034.

In making that decision, the Court applies the familiar four-factor test for establishing the propriety of preliminary injunctive relief. *Osthus v. Whitesell Corp.*, 639 F.3d 841, 844-45 (8th Cir. 2011); *Sharp*, 172 F.3d at 1038-

39; *see Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc). That test weighs the threat of irreparable harm to the movant, the balance of harms, the movant's likelihood of success on the merits, and the public interest. *McKinney ex rel. NLRB v. S. Bakeries, LLC,* 786 F.3d 1119, 1122-23 (8th Cir. 2015) (citing *Dataphase,* 640 F.2d at 113).

### 1. IRREPARABLE HARM

The Court's inquiry must focus initially on the question of irreparable harm: the Board must demonstrate "that the case presents one of those rare situations in which the delay inherent in completing the adjudicatory process will frustrate the Board's ability to remedy the alleged unfair labor practices." *Id.* at 1123; *Sharp,* 172 F.3d at 1039. The relevant inquiry is whether this is the rare case when a preliminary injunction is necessary to preserve the effectiveness of the ordinary adjudicatory process. *McKinney,* 786 F.3d at 1124.

Thus, the irreparable harm to be addressed under § 10(j) is not harm to individual employees—rather, it is the harm to the collective bargaining process or to other protected employee activities if a remedy must await the Board's full adjudicatory process. *See Sharp,* 172 F.3d at 1038; *Hubbel v. Patrish LLC,* 903 F. Supp. 2d 813, 817 (E.D. Mo. 2012); *Chester ex rel. NLRB v. Eichorn Motors, Inc.,* 504 F. Supp. 2d 621, 627 (D. Minn. 2007). The Court must be able to conclude with "reasonable probability" from the circumstances that the remedial purposes of the NLRA would be frustrated unless immediate action is taken. *Minnesota Min. & Mfg. Co.,* 385 F.2d at 270; *see Sharp,* 172 F.3d at 1039. The Court proceeds to examine the likelihood of success on the merits, and the other relevant factors, only if the Board clears the "relatively high hurdle" of establishing irreparable injury. *McKinney,* 786 F.3d at 1123; *see Sharp,* 172 F.3d at 1039.

If an employer replaces pro-union employees with nonunion employees, continues to blatantly violate the NLRA, or refuses to bargain and unilaterally withdraws recognition from a union that has demonstrated support, a preliminary injunction may appropriately prevent or counteract the decline in support for the union that is likely to follow. *See McKinney*, 786 F.3d at 1124-25. Here, the Board argues that irreparable harm will come from Noah's Ark's ongoing refusal to engage in collective bargaining:

> refusal to bargain in good faith is likely to irreparably erode employees' support for their chosen representative over time because the Union is unable to protect the employees or affect their working conditions while the case is pending before the Board. The employees predictably will shun the Union because their working conditions will have been virtually unaffected by collective bargaining for several years, and they will have little, if any, reason to support the Union. This lost support for the Union will not be restored by a final Board order in due course. By the time the Board issues its final order, it will be too late; employees will have given up on their union.

Filing 2 at 31. The Court agrees. As the Board points out, eroding support for the Union is already reflected in the record: a number of employees have already asked to stop paying Union dues, and given the timing, it's not hard to connect that to the Union's ineffectual efforts to negotiate on the employees' behalf. But that ineffectiveness is attributable to Noah's Ark's obstruction.[4]

---

[4] There is, in other words, nothing to suggest that the Union's loss of support preceded Noah's Ark's unfair, anti-Union labor practices. *Cf. McKinney*, 786 F.3d at 1124-25.

And the Board's ultimate remedial action is likely to have little effect if it only results in compelling Noah's Ark to engage in collective bargaining with a Union that's already lost its base of support.

In addition, as will be discussed below, the Court finds that the Board is at least reasonably likely to succeed on its claim that several employees were unlawfully fired. The Court recognizes that the purpose of preliminary injunctive relief in this context is to protect the collective bargaining process, not individual employees—but, at least attempting to reinstate those employees is part of preserving the Board's authority to provide effective relief, and vindicating the Union's authority to represent its bargaining unit. And while a substantial time has passed since those terminations, the passage of even more time will further decrease the likelihood that those workers will be available for reinstatement. *See Chester*, 504 F. Supp. 2d at 628.

In sum, Noah's Ark's blatant failure to engage in good-faith collective bargaining, and refusal as a practical matter to recognize the Union at all, establishes the propriety of preliminary injunctive relief to "appropriately prevent or counteract the decline in support for the union that is likely to follow." *McKinney*, 786 F.3d at 1124-25.

### 2. LIKELIHOOD OF SUCCESS ON THE MERITS

The Court must consider the Board's likelihood of success on the merits, not in isolation, but in the context of the relative injuries to the parties and the public. *Sharp*, 172 F.3d at 1039. The purpose of this inquiry into the merits is not to second guess the Board's decision to commence enforcement proceedings. *Id*. Rather, likelihood of success is relevant to the issuance of a preliminary injunction because the need for the Court to act is, at least, in part, a function of the validity of the applicant's claim. *Id*. A party seeking injunctive relief need not necessarily show a greater than 50 percent likelihood that it will

prevail on the merits. *Planned Parenthood Minnesota, ND, SD v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008). But an absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).

The Board's supplemental brief on the administrative record (filing 13) organizes the evidence into eight categories—four ways in which Noah's Ark allegedly interfered with, restrained, or coerced employees in the exercise of their protected rights, in violation of § 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), and four ways in which Noah's Ark allegedly refused to bargain collectively in violation of § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). The Court will consider the Board's likelihood of success in each area.

## (a) Section 8(a)(1)

Section 7 of the NLRA, 29 U.S.C. § 157, guarantees employees the right to organize and bargain collectively, and under § 8(a)(1), an employer commits an unfair labor practice if it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of their rights" under § 7. *S. Bakeries, LLC v. Nat'l Labor Relations Bd.*, 871 F.3d 811, 820 (8th Cir. 2017).

### (i) Anti-Union Statements

The first thing the Board points to as a violation of § 8(a)(1) is perhaps the most obvious: statements by Noah's Ark management that Noah's Ark intended to get rid of the Union. *See* filing 13 at 2. Such statements have been seen not only as context for other alleged violations of § 8, but as violations of § 8(a)(1) in their own right. *See NLRB v. Hardesty Co.*, 308 F.3d 859, 866-67 (8th Cir. 2002). There is also evidence that Noah's Ark directly connected pay raises to removal of the Union—which is perhaps more important, because it's crystal-clear that an employer violates § 8(a)(1) by offering employees benefits

conditioned on their choice of a bargaining representative. *Sioux City Foundry Co. v. NLRB*, 154 F.3d 832, 841 (8th Cir. 1998). And Noah's Ark does not even attempt to defend those remarks. *See* filing 19.

### *(ii) Firings*

The next issue, though, is hotly contested: the Board contends that Noah's Ark violated § 8(a)(1) with its March 27, 2018 firing of several of the employees who had gathered in the cafeteria to address wage differences with management. *See* filing 13 at 2-3. The Board characterizes their walkout as a "work stoppage" protected by § 7. Filing 13 at 2-3. Noah's Ark, on the other hand, insists that the employees abandoned their jobs, rather than being fired—and that even if they were fired, their conduct was an "unprotected wildcat strike." Filing 19 at 6-10.

The Court finds little merit to the argument that the employees weren't fired—rather, they were told that they could either return to work (as opposed to addressing their grievance) or be removed by police. For present purposes, there's at least a reasonable likelihood that the Board will succeed on its claim that the employees were fired. So, according to Noah's Ark, that places the case in the rubric of *Wright Line*, 251 NLRB 1083 (1980). Filing 19 at 7. The Court isn't so sure about that.

The *Wright Line* analysis "is applied when an employer articulates a facially legitimate reason for its termination decision, but that motive is disputed." *Tschiggfrie Props., Ltd. v. Nat'l Labor Relations Bd.*, 896 F.3d 880, 885 (8th Cir. 2018). It's a burden-shifting framework:

The Board's General Counsel must prove that the employee's protected conduct was a substantial or motivating factor in the adverse action. If, and only if, the General Counsel meets that

burden, the burden shifts to the employer to exonerate itself by showing that it would have taken the same action for a legitimate, nondiscriminatory reason regardless of the employee's protected activity.

*Id.* (cleaned up). But there's no real disagreement here about *why* the employees lost their jobs: because they gathered in the cafeteria to complain about their wages, and didn't return to work from the parking lot when the plant manager gave them a choice. Noah's Ark has admitted as much. In other words, this isn't a paradigmatic *Wright Line* case because the reason for termination isn't disputed. So, the real question is whether the employees' activity was protected by § 7.

Noah's Ark contends that the employees were engaged in a strike, not authorized by the Union—so, it was a "wildcat strike" unprotected by the NLRA. Filing 19 at 7. And it has been held that while a "total strike" is a concerted activity protected against employer interference by §§ 7 and 8(a)(1), deliberate "slowdowns" and "walkouts" by the employees to exert pressure on the employer to accept bargaining demands are unprotected concerted activities, and the employer is free to discharge the participating employees for their unlawful disloyal tactics. *NLRB v. Blades Mfg. Corp.*, 344 F.2d 998, 1005 (8th Cir. 1965).

It's clear, though, that an employer violates § 8(a)(1) by discharging *even a non-union employee* for organizing or implementing a collective walkout to protest working conditions. *JCR Hotel, Inc. v. NLRB*, 342 F.3d 837, 840 (8th Cir. 2003). "To be considered *concerted* activity, [i]t is sufficient that the employee intends or contemplates, as an end result, group activity which will also benefit some other employees." *Id.* (internal quotation omitted).

In that regard, the Court finds it difficult to distinguish the Eighth Circuit's decision in *Roseville Dodge, Inc. v. NLRB*, 882 F.2d 1355 (8th Cir. 1989). In that case, the employees were non-union mechanics who asked their employer's president to meet with them to discuss grievances about pay, supplies, and improper treatment. *Id*. at 1356. They gathered in the break area and refused to work until the company president met with them. *Id*. They were told that they had the options of going to work, leaving the premises, or remaining on the premises and being fired. *Id*. at 1357. So, they left, and worked the next day without incident. *Id*. But then they found out that their supervisor had been fired, and they had seen that the employer placed a newspaper advertisement offering a starting bonus for new mechanics, leading them to believe they would be replaced. *Id*. They met outside the facility early the next morning, and went to a nearby restaurant to discuss their next move. *Id*. They decided to request another meeting to address their concerns, but when they came back to work, they were told they had been fired. *Id*.

The NLRB found for the mechanics on their § 8(a)(1) claim, and on appeal, the Eighth Circuit agreed. The Eighth Circuit rejected the employer's claim that the employees had engaged in a "sitdown strike" or "intermittent or recurrent strike"—in essence, a wildcat strike—explaining that "[t]he evidence shows that this work stoppage was a peaceful attempt by unsophisticated workers to notify the company—which did not have a grievance procedure—of their dissatisfaction with working conditions because other methods of communication had proven futile." *Id*. at 1359. And they "did not have a preconceived plan to engage in a series of strikes to harass the [employer]." *Id*.; *see also* NLRB v. EYM King of Mo., LLC, 726 F. App'x 524, 526 (8th Cir. 2018).

The Court recognizes one potential distinction: there's no indication in *Roseville Dodge* that the employees *had* a union. And that can matter. *See*

*Emporium Capwell Co. v. W. Addition Cmty. Org.*, 420 U.S. 50 (1975). But the Court's not persuaded it's a meaningful difference in this case. *See Wilson Trophy Co. v. NLRB*, 989 F.2d 1502, 1508 (8th Cir. 1993). Specifically, the Court isn't persuaded that Noah's Ark can rely on the no-strike provision of the 2013 CBA, *see* filing 19 at 8, when it had allowed that contract to expire. And more generally, the Court's not persuaded that Noah's Ark can assert, "But they had a union!" as a defense where the record is replete with evidence that Noah's Ark refused to meaningfully engage with the Union. The Court will address that in more detail below, but at this point it suffices to say that having done everything it could to marginalize the Union, Noah's Ark shouldn't be allowed to rely on the Union's survival to justify firing employees who would otherwise have clearly been engaged in concerted activity protected by § 7.

The Court finds that the Board is sufficiently likely to succeed on the merits of its claim that Noah's Ark fired employees for activity protected by § 7, in violation of § 8(a)(1).

### (iii) Ministerial Aid

Next, the Board asserts that Noah's Ark violated § 8(a)(1) by providing "more than ministerial aid" to employees who wanted to resign from the Union and revoke their dues checkoff authorizations. Filing 13 at 3. The Court is less persuaded by the Board's argument on this point.[5]

---

[5] The Board also relies on Noah's Ark's solicitation of confidentiality forms in support of this argument. *See* filing 13 at 4-5. But it's not clear to the Court how that interfered with, restrained, or coerced employees *in the exercise of their protected rights*—that is, it's not clear why the confidentiality forms would amount to a § 8(a)(1) violation. Rather, those forms are relevant to the Board's claim of a § 8(a)(5) violation, and will be addressed in that context.

An employer does violate § 8(a)(1) by discouraging employees from engaging in union activity. *JHP & Assocs., LLC v. NLRB*, 360 F.3d 904, 909 (8th Cir. 2004). So, it's a violation of § 8(a)(1) for an employer to actively support or sponsor an effort to reduce employee support for a union. *See NLRB v. Am. Linen Supply Co.*, 945 F.2d 1428, 1433 (8th Cir. 1991). But the NLRB has interpreted the NLRA to permit an employer to provide "ministerial aid" to employees seeking to leave a union. *See E. States Optical Co.*, 275 NLRB 371, 372 (1985).

The parameters of the "ministerial aid" standard are not entirely clear. *See Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R. v. NLRB*, 414 F.3d 158, 164 (1st Cir. 2005); *Vic Koenig Chevrolet, Inc. v. NLRB*, 126 F.3d 947, 949-50 (7th Cir. 1997). The Seventh Circuit has held that the line is crossed only when the employer's "assistance to the employees who are seeking to disconnect from the union . . . interfere[s] with employee free choice." *Vic Koenig Chevrolet, Inc.*, 126 F.3d at 950.

But regardless of where the line between "ministerial aid" and active sponsorship is drawn, the Court finds little evidence that it was crossed here. It has been held permissible, for instance, not only for an employer to process employee requests to revoke dues checkoff authorizations, but to bring the employees' right to do so to their attention, and to furnish information about how to do so upon request. *Texaco, Inc. v. NLRB*, 722 F.2d 1226, 1231 (5th Cir. 1984); *Landmark Int'l Trucks, Inc. v. NLRB*, 699 F.2d 815, 820 (6th Cir. 1983). And the evidence here is that the employees whom Noah's Ark provided with revocation forms to sign were provided with those forms *after* proactively asking to rescind their dues checkoff.

Now, that does not mean the Administrative Law Judge, who heard and observed the witnesses, could not conclude otherwise. It's certainly not beyond

the pale, given the anti-Union animus reflected in the rest of the record, to suspect that some chicanery might have been involved in the decisions of a significant number of employees to revoke their dues checkoffs. *See NLRB v. Rockline Indus., Inc.*, 412 F.3d 962, 968 (8th Cir. 2005) (relying on circumstantial evidence of anti-union animus to support § 8(a)(1) violation). But the Court's best reading of the record does not support a likelihood that the Board will succeed on this claim.

### (iv) Provision of Counsel

Finally, the Board argues that Noah's Ark violated § 8(a)(1) by providing outside counsel for employees subpoenaed by the Board. The Court has serious reservations about the propriety of that conduct—but, the Court has trouble seeing how it proves a violation of § 8(a)(1). Perhaps there is some proscription against conduct that interferes with a Board's investigation of allegedly unfair labor practices—but § 8(a)(1) prohibits interference with *employees* engaged in protected activity, not the Board.

The authority cited by the Board in support of its argument is not persuasive. *See* filing 2 at 20. To begin with, the Board relies on *Midwest Television, Inc., d/b/a KFMB Stations & Am. Fed'n of Television & Radio Artists, San Diego Local*, 349 NLRB 373 (2007) and *S.E. Nichols, Inc.*, 284 NLRB 556 (1987)—but in each of those cases, the employer had offered employees counsel from *the employer's attorney*, and the conflict of interest was the issue. *See Midwest Television*, 349 NLRB at 387; *S.E. Nichols*, 284 NLRB at 581-82. Noah's Ark, on the other hand, took pains to avoid such a conflict in this case. The Board also relies on the NLRB's decision in *Florida Steel Corp.*, 233 NLRB 491, 494 (1977)—and while that decision supports the Board's argument, the Board neglected to mention that the First Circuit refused to enforce it. *See Florida Steel Corp. v. NLRB*, 587 F.2d 735 (1st Cir. 1979).

Indeed, the Court of Appeals specifically found that the employer's letter offering to help employees find legal counsel before speaking to a Board agent "show[ed] no tendency to interfere with, restrain, or coerce the employees, nor does the record show in any manner that the General Counsel's investigation or presentation of his case was hampered nor made more difficult as a result of this letter." *Id*. at 753; *accord NLRB v. Garry Mfg. Co.*, 630 F.2d 934, 944 (3d Cir. 1980).

The same is largely true here. The Court does have misgivings about the way in which some employees reported being sent to speak to counsel. . . nor does the Court believe that Noah's Ark retained Kutak Rock to advise its employees out of a sincere and unadulterated eleemosynary concern for their wellbeing. Surely, Noah's Ark was self-interested, at least to some extent. But there's also nothing in the record to suggest that Kutak Rock's attorneys didn't fulfill their ethical obligation to represent the interests of the employees, rather than Noah's Ark. *See* filing 18-3 at 15. Nor does the Board identify any way in which its investigation was actually obstructed.

The Board also suggests that Noah's Ark "subsequently interrogated employees about their interviews with the Board by questioning them about the subject matters discussed." Filing 13 at 6. But the evidence is more benign: "employees" actually means "employee," and that employee reported that the day after his interview, he was at his workstation when a manager asked him "what the Feds had asked [him]." Filing 15 at 59. The employee said, "[a] bunch of dumb stuff," and the manager laughed and left. Filing 15 at 60. They repeated the conversation the next day. Filing 15 at 60. That conduct was almost certainly inappropriate—and, it might even be enough to sustain a finding by the Administrative Law Judge that the employee questioned was interfered with, restrained, or coerced in violation of § 8(a)(1). *See generally*

*Tschiggfrie Props., Ltd.*, 896 F.3d at 887-88. But this Court, as the factfinder in this case, is not persuaded that the encounter was that consequential. Accordingly, the Court is not convinced that Noah's Ark violated § 8(a)(1) with its conduct surrounding the NLRB investigation.

### (v) Section 8(a)(1) — Conclusion

In sum, the Court is not persuaded that the Board is likely to succeed on its claims that Noah's Ark violated § 8(a)(1) by providing forms for revoking the dues checkoff, or by providing counsel for employees subpoenaed by the Board. But the Court is persuaded that the Board is likely to succeed on its claims that Noah's Ark's numerous anti-Union statements to employees, and the termination of employees engaged in concerted activity protected by § 7, were violations of § 8(a)(1).

### (b) Section 8(a)(5)

It's an unfair labor practice for an employer to refuse to bargain collectively with the representatives of its employees. § 8(a)(5). The Board makes a very convincing case that Noah's Ark violated that rule in a number of different ways. Filing 13 at 6-10.

### (i) Refusal to Furnish Information

To begin with, the Board contends that Noah's Ark violated § 8(a)(5) by contumaciously refusing to provide the Union with information about its bargaining unit employees. Filing 13 at 6-7. When requested, an employer must provide a union with information that is necessary and relevant to the union's role as the employees' collective bargaining representative. *Hardesty Co.*, 308 F.3d at 863 (citing *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-36 (1967)). The employer's duty to produce information sought by a union turns

on the likelihood that the request, if granted, would produce necessary and relevant information. *Id.* at 863-64. And the relevance of information to a union's role as a collective bargaining representative is determined on a broad, "discovery-type standard." *Id.* at 863 (citing *Acme Indus. Co.*, 385 U.S. at 437)).

Given that "liberal standard," *see id.*, it's not surprising that Noah's Ark does not even attempt to defend its conduct in this regard, *see generally* filing 19. It's also hard to separate this issue from the substantial evidence in the record that employees were coerced or even tricked into signing "nondisclosure forms" which were obviously intended to frustrate the Union's requests for information. The Board is likely to succeed on this claim.

### (ii) Unilateral Wage Changes

The evidence is also undisputed that Noah's Ark unilaterally raised employee wages, during the course of collective bargaining (or at least what should have been collective bargaining). That might seem harmless, but it's a violation of the employer's duty to bargain in good faith to unilaterally change the conditions of employment presently under negotiation. *Hardesty Co.*, 308 F.3d at 864. "Such action by the employer is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." *Id.* (quotation omitted). As the Eighth Circuit has explained,

[o]n the one hand, § 8(a)(5) forbids an employer from making unilateral changes in the conditions of employment in order to preserve the status quo. Intuitively, if the employer engages in unilateral action, there may be nothing left for the parties to negotiate about and § 8(a)(5) would thus be violated. On the other hand, § 8(a)(5)'s prohibition is also literal. Section 8(a)(5) makes it illegal for an employer to refuse to bargain collectively with the

representatives of his employees. Quite simply, the employer must bargain with the union about changes it wishes to make.

*Id*. at 865. Accordingly, as the Supreme Court has said,

[u]nilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance.

*NLRB v. Katz*, 369 U.S. 736, 747 (1962); *accord Hardesty Co.*, 308 F.3d 865. And perhaps most relevant in this case, given Noah's Ark's other behavior, "[s]uch unilateral action will also often send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them." *Hardesty Co.*, 308 F.3d at 865.

Noah's Ark clearly made unilateral changes to employee wages, which are generally in the heartland of issues subject to collective bargaining. And Noah's Ark hasn't defended that conduct. *See* filing 19. Obviously, the Board is likely to succeed on this claim.

### (iii) Bad Faith Bargaining

It is well established that under the NLRA, an employer is under a duty to enter into sincere, good faith negotiations with the constituted representative of the employees, with an intent to settle the differences and arrive at an agreement. *Id*. at 866. The Board contends that Noah's Ark failed in that duty. Filing 13 at 7-9. Noah's Ark counters that it met with the Union

"approximately twenty times," and insists that the parties were just "unable to come to an agreement on any of the important issues. . . ." Filing 19 at 4.

It is true that the obligation to bargain in good faith does not compel either party to agree to a proposal or require the making of a concession. *Id*. at 865. While the NLRA requires an employer and a union to bargain in good faith, it does not require them to reach agreement. *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 616 (1986).

But when determining whether an employer failed to bargain in good faith, the Court examines the employer's conduct in the totality of the circumstances in which the bargaining took place. *Hardesty Co.*, 308 F.3d at 865. And "where an employer conducts negotiations as a kind of charade or sham, all the while intending to avoid reaching an agreement[,] that employer violates § 8(a)(5) by engaging in surface bargaining." *Id*.

It's hard to imagine a clearer example of surface bargaining than the one evidenced by the record in this case. Even setting aside the other anti-Union statements made by Noah's Ark's management, the course of "bargaining" alone almost conclusively demonstrates a refusal to bargain in good faith. The "approximately twenty" meetings relied upon by Noah's Ark, *see* filing 19 at 4, mean little when Noah's Ark only participated in those meetings by sending a representative without authority to bargain, whose function was to receive the Union's proposals and transmit them to management to be summarily rejected. Unilateral implementation of wage increases *greater* than those offered the Union (because none *were* offered) is also indicative of bad faith, "for such action is necessarily inconsistent with a sincere desire to conclude an agreement with the union." *Katz*, 369 U.S. at 745; *see NLRB v. Crompton-Highland Mills*, 337 U.S. 217, 225 (1949).

And that's just *if* the Court sets aside Noah's Ark's other anti-Union statements—which, of course, isn't required. *Hardesty Co.*, 308 F.3d at 865. Instead, it's appropriate to "consider[] these statements in conjunction with the Company's regressive and largely unexplained bargaining behavior"—in which context, combined with Noah's Ark's other conduct, those statements "shed light on what might otherwise merely be hard bargaining and isolated § 8(a)(1) violations." *Id*. at 868.

In sum, both Noah's Ark's evident anti-Union animus and the otherwise-inexplicable course of negotiations demonstrate a refusal to bargain in good faith. The Board is likely to succeed on this claim.

### (iv) Premature Declaration of Impasse

Finally, the Board contends that Noah's Ark violated § 8(a)(5) by prematurely declaring an impasse and imposing its "Best and Final Proposal." Filing 13 at 9-10. Noah's Ark responds by insisting that the parties were, in fact, at an impasse. *See* filing 19 at 14.

An employer violates sections 8(a)(1) and (a)(5) of the NLRA when the employer makes a unilateral change in a term or condition of employment without first bargaining to an impasse on that term. *NLRB v. Whitesell Corp.*, 638 F.3d 883, 890 (8th Cir. 2011) (citing *Katz*, 369 U.S. at 743).

> An impasse occurs when good faith negotiations have exhausted the prospects of concluding an agreement, leading both parties to believe that they are at the end of their rope. Whether the parties have reached this point is a case-specific inquiry; there is no fixed definition of an impasse or deadlock which can be applied mechanically to all factual situations. Among the factors that the NLRB considers in evaluating the existence of an impasse are the

bargaining history, the good faith of the parties in negotiation, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, and the contemporaneous understanding of the parties as to the state of negotiations.

*Id.* at 890 (cleaned up).

Given the Court's discussion of Noah's Ark's failure to negotiate in good faith, it should be evident that the Court is also unpersuaded the parties were really at an impasse. An impasse presupposes a reasonable effort at good faith bargaining. *Pub. Serv. Co. of Oklahoma v. NLRB*, 318 F.3d 1173, 1180 (10th Cir. 2003); *NLRB v. Triple A Fire Prot., Inc.*, 136 F.3d 727, 738 (11th Cir. 1998); *see Whitesell Corp.*, 638 F.3d at 892-93. Having refused to bargain in good faith, Noah's Ark could hardly conclude that actually bargaining in good faith would be futile.

Furthermore, before the parties reach an impasse in negotiations, employers are obligated to maintain the status quo as to wages and working conditions. *See Powell v. Nat'l Football League*, 930 F.2d 1293, 1300 (8th Cir. 1989). Noah's Ark didn't. And even had the parties bargained to an impasse, that would only have permitted Noah's Ark to make unilateral changes consistent with offers the Union had rejected. *United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp.*, 81 F.3d 798, 802 (8th Cir. 1996). But here, Noah's Ark simply deemed its "final" offer rejected, despite not having set a deadline for acceptance or received an actual notice of rejection from the Union. Furthermore, the duty to collectively bargain survives an impasse—employers must stand ready to resume bargaining. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 244 (1996). Noah's Ark indicated no such readiness. *See* filing 18-4 at 84, 117. Noah's Ark's failure to follow the rules

applicable to a valid impasse is also suggestive of bad faith in declaring an impasse in the first place.

In sum, the Board is also likely to succeed on its claim that Noah's Ark violated § 8(a)(5) by prematurely declaring an impasse in negotiations.

### (v) Section 8(a)(5) — Conclusion

In sum, the Court is persuaded that the Board is likely to succeed on its claims that Noah's Ark violated § 8(a)(5) by refusing to provide the Union with necessary and relevant information, imposing unilateral wage changes, refusing to bargain in good faith, and prematurely declaring an impasse.

### 3. REMAINING *DATAPHASE* FACTORS

The remaining factors to be considered in assessing the propriety of injunctive relief—the balance of harms and the public interest—also weigh in favor of a preliminary injunction. The harm to the Union has already been discussed, and Noah's Ark has not identified any harm to itself that would result from an injunction. *See* filing 19. Finally, the public interest in this case is best found in the public policy represented by the NLRA, and will be vindicated by injunctive relief.

Based on all the relevant factors, as discussed above, the Court concludes that preliminary injunctive relief is appropriate. What remains to be considered is the appropriate scope of that relief.

### 4. SCOPE OF INJUNCTION

The Board has provided the Court with a proposed order setting forth, in detail, the injunctive relief the Board believes appropriate. The Court has reviewed that proposal carefully, in light of its own findings regarding the need for injunctive relief in this case and the Board's likelihood of success on the

merits, and aware of its obligation to award only the relief "necessary either to preserve the status quo or to prevent frustration of the basic remedial purpose of the [NLRA]." *Sharp*, 172 F.3d at 1039; *see McKinney*, 786 F.3d at 1125. With that in mind, the Court orders the following:[6]

1. Noah's Ark shall not:

   a. Tell employees there is no union in the facility;

   b. Tell employees Noah's Ark is going to remove the Union from the facility;

   c. Tell employees that going forward there will be no union in the facility;

   d. Tell employees there will be no raise in wages because of the Union;

   e. Threaten to call the police on employees because the employees engaged in protected, concerted activities related to their terms and conditions of employment;

   f. Threaten to fire employees for engaging in protected, concerted activities related to their terms and conditions of employment;

   g. Fire employees for engaging in protected, concerted activities related to their terms and conditions of employment;

   h. Coerce employees into signing confidentiality forms;

   i. Refuse to bargain collectively with the Union as the exclusive collective-bargaining representative of the following employees concerning rates of pay, wages, hours of work, and other terms and conditions of employment: All production, maintenance,

---

[6] Unless otherwise specified, any obligation imposed on "Noah's Ark" by this order shall extend to the respondent and its officers, agents, servants, employees, attorneys, and any persons acting in concert or participation with it or them.

shag drivers and distribution employees, excluding office clerical employees, professional employees, guards and supervisors as defined in the NLRA;

j. Directly deal with employees regarding terms and conditions of employment;

k. Refuse to provide the Union with information originally requested on November 6, 2017, or any information that is necessary and relevant to its role as the exclusive representative of the employees of the bargaining unit;

l. Unilaterally change bargaining unit employees' wage rates without bargaining with the Union;

m. Engage in bad faith bargaining with the Union for the purpose of negotiating a successor CBA;

n. Engage in conduct intended to undermine the Union's bargaining representative status;

o. Implement a last, best and final offer absent agreement or good-faith impasse; or

p. Engage in conduct which, in any manner, interferes with rights under § 7 of the NLRA.

2. Noah's Ark shall, pending final NLRB adjudication:

a. On or before May 17, 2019, offer immediate reinstatement, in writing, to each employee fired on or about March 27, 2018 for his or her protected concerted activity, as described in § II(2)(a)(ii) of this order—or, only if the position no longer exists, to a substantially equivalent position, without prejudice to seniority or any other rights and privileges previously enjoyed;

b. On or before May 17, 2019, expunge all references to the discharges from those fired employees' files, and not rely on them in any future adverse employment actions;

c. On or before May 17, 2019, furnish the Union with the information it requested on November 6, 2017, as well as a list of all current bargaining unit employees' names and contact information;

d. Upon the Union's request, bargain in good faith with the Union on a schedule providing for good-faith bargaining for not less than 24 hours per month and not less than 6 hours per session, or on another schedule to which Noah's Ark and the Union have mutually agreed, and appoint a representative to this bargaining with the authority to bargain, until the parties reach a complete CBA or a good-faith impasse in negotiations.

e. Provide the Union with advance notice and an opportunity to bargain over any intended changes to employees' wages, hours, and other terms and conditions of employment;

f. At the Union's election, rescind any or all of the unlawful unilateral changes to the employees' terms and conditions of employment, including any implemented pursuant to Noah's Ark's "Best and Final Proposal";

g. On or before May 17, 2019, post copies of this order in all locations where other notices to employees are customarily posted, and maintain such postings free from all obstructions and defacements pending conclusion of the Board's administrative proceeding;

h.  On or before May 31, 2019, file with the Court, and serve upon the Regional Director of Region 14 of the Board, a sworn affidavit from a responsible official of Noah's Ark setting forth with specificity the manner in which it has complied with this order, including the location or locations in which copies of this order were posted.

### 5. MOTION FOR ORAL ARGUMENT

The Court carefully considered the Board's motion for oral argument (filing 20). But due to circumstances beyond the Court's control, the undersigned's availability has been limited since the Board's petition was ripe, and the Court's upcoming calendar is extremely crowded (due in no small part to the three jury trials the Court has scheduled during the next four weeks). As a result, trying to schedule an oral argument would have substantially delayed the Court's disposition of this case—which seems at odds with the purpose of the Board's petition. Accordingly, the Court will deny the Board's request for argument.

## III. CONCLUSION

For the foregoing reasons, the Court will grant the Board's "Motion for Hearing on Affidavits" (filing 4), which the Court has construed a motion for injunctive relief consistent with the Board's petition (filing 1). *See* filing 6. One final note: because this memorandum and order is fully dispositive of the petition (which requested only interim relief), the Court will close this case for administrative purposes. That does not, of course, preclude the Court from exercising its full authority to assure compliance with this order. The Court will also order the Board to regularly report to the Court on the status of the

administrative proceedings, and the Court will enter a final judgment when the NLRB proceedings are concluded.

IT IS ORDERED:

1.    The Board's motion for hearing on affidavits (filing 4) is granted.

2.    The Board's motion for oral argument (filing 20) is denied.

3.    Noah's Ark is preliminarily enjoined as set forth more fully in this memorandum and order.

4.    This case is closed for administrative purposes.

5.    On or before August 8, 2019, and each 90 days thereafter, the Board shall file a brief status report indicating whether the administrative proceedings are ongoing.

6.    The Clerk of the Court shall set a status report deadline for August 8, 2019.

Dated this 10th day of May, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge