IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PAULA S. SAWYER, Acting Regional Director of the Fourteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>Petitioner,<br><br>vs.<br><br>NOAH'S ARK PROCESSORS, LLC d/b/a WR RESERVE,<br><br>Respondent. | 4:19-CV-3016<br><br>MEMORANDUM AND ORDER OF CONTEMPT |

This matter is before the Court on the motion (filing 26) of the Acting Regional Director of the National Labor Relations Board to hold the respondent, Noah's Ark Processors, in contempt for its noncompliance with the Court's Memorandum and Order of May 10, 2019 (filing 21) awarding the Board injunctive relief pursuant to § 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j). Based on the Board's initial showing, the Court ordered Noah's Ark to show cause why the Board's motion should not be granted. Filing 30. Noah's Ark has <u>not</u> shown cause, to put it mildly.[1] The

---

[1] The Court makes that finding on the record, without an evidentiary hearing, for two reasons. First, Noah's Ark did not request an evidentiary hearing. *See* filing 32. And second, on the record, there is no need for a hearing—as will be explained, Noah's Ark has not substantively challenged the Board's evidence. The opportunity to be heard does not necessarily entitle the subject of a motion for sanctions to an evidentiary hearing, and an evidentiary hearing serves as a forum for finding facts; as such, its need can be obviated when there is no disputed question of fact or when sanctions are based entirely on an established

Court will grant the Board's motion to hold Noah's Ark in contempt, and set this case for argument on the appropriate compensatory and coercive sanctions and discussion of how Noah's Ark can purge itself of its contempt.

BACKGROUND

Briefly summarized, in its May 10 memorandum and order, the Court found convincing evidence that Noah's Ark had engaged in a number of unlawful anti-union practices. Filing 21. As relevant, the Court ordered Noah's Ark "to bargain collectively with the [United Food and Commercial Workers Union Local No. 293] as the exclusive collective-bargaining representative" of covered employees "concerning rates of pay, wages, hours of work, and other terms and conditions of employment[,]" and not to "[e]ngage in bad faith bargaining." Filing 21 at 27-28. Noah's Ark was also ordered not to "[d]irectly deal with employees regarding terms and conditions of employment." Filing 21 at 28. And more generally, Noah's Ark was ordered not to "[e]ngage in conduct intended to undermine the Union's bargaining representative status" or "[e]ngage in conduct which, in any manner, interferes with rights under § 7 of the NLRA." Filing 21 at 28.

Noah's Ark was also ordered to take affirmative steps to meet its legal obligations. Specifically, Noah's Ark was ordered to take a number of actions on or before May 17, 2019, including:

- furnish the Union with bargaining unit information it had requested on November 6, 2017, as well as a list of all current bargaining unit employees' names and contact information;

---

record. *In re Reed*, 888 F.3d 930, 938 (8th Cir.), *cert. denied sub nom. Briggs v. Rendlen*, 139 S. Ct. 461 (2018).

- rescind any or all of the unlawful unilateral changes to the employees' terms and conditions of employment; and
- file an affidavit setting forth the manner in which Noah's Ark had complied with the Court's order.

Filing 21 at 29-30. And Noah's Ark was expressly ordered to

> [u]pon the Union's request, bargain in good faith with the Union on a schedule providing for good-faith bargaining for not less than 24 hours per month and not less than 6 hours per session, or on another schedule to which Noah's Ark and the Union have mutually agreed, and appoint a representative to this bargaining with the authority to bargain, until the parties reach a complete CBA or a good-faith impasse in negotiations.

Filing 21 at 29. Noah's Ark did not appeal from the Court's order, although it could have. *See* 28 U.S.C. § 1292(a)(1); *Abbott v. Perez*, 138 S. Ct. 2305, 2319-20 (2018).

On May 13, 2019—the Monday after the Court's memorandum and order—counsel for the Union wrote counsel for Noah's Ark, requesting a bargaining schedule and demanding that Noah's Ark "[r]escind all of the unlawful unilateral changes to the employees' terms of conditions of employment[.]" Filing 28 at 36. On May 31, counsel for Noah's Ark replied, suggesting four specific dates in June for negotiation. Filing 28 at 49-50. Counsel for the Union replied the same day, promising to check those dates with the Union, and reminding opposing counsel that Noah's Ark had failed to

provide bargaining unit information to the Union as the Court had ordered. Filing 28 at 48-49.[2]

In what was either a remarkable coincidence or an act of bad faith, the dates Noah's Ark had proposed for negotiation were also the dates of Union officer nominations, which required the Union's officials to be at a number of different facilities where Union-represented employees worked, and to be there for different workers' shifts. Filing 28 at 47-48, 189. Those dates had been known to Noah's Ark, because they had been posted by Noah's Ark at its facility at the Union's request. Filing 28 at 47-48, 189.

On June 3, the Union's counsel advised counsel for Noah's Ark of the scheduling conflict, and said that the Union would be generally available for bargaining sessions in June. Filing 28 at 47-48. But that never happened, because counsel for Noah's Ark did not respond until June 28 (the last business day in June) proposing dates in July. Filing 28 at 47. Noah's Ark was also aware that Union officer elections were July 16—so not surprisingly, July 16 was one of the dates proposed. Filing 28 at 47, 189. But the parties did, after a few more emails, agree to meet on the other three dates. Filing 28 at 44.

So Noah's Ark and the Union finally met at 10 a.m. on July 23, 2½ months after Noah's Ark had been ordered to meet with the Union and

---

[2] In addition, the Board sent Noah's Ark a letter on June 11 asking about Noah's Ark's compliance with the Court's order, including whether Noah's Ark had provided the Union "with the information it requested on November 6, 2017, as well as a list of all current bargaining unit employees' names and contact information." Filing 28 at 88-89. Counsel for Noah's Ark replied on June 18, answering that question by stating that Noah's Ark had provided the Union "a list of all active employees that were hired July 1, 2017, to present and a list of all paying Union members that are active." Filing 28 at 89. In other words, Noah's Ark failed to answer the question regarding the information requested by the Union in November 2017.

negotiate in good faith. Filing 28 at 54. Noah's Ark was represented by administrative clerk Mary Junker and CEO Fischel Ziegelheim. Filing 28 at 54. The Union began by asking if Noah's Ark would finally provide the information that the Union had requested in November 2017 and the Court had ordered Noah's Ark to provide to the Union in May 2019. Filing 28 at 54. Ziegelheim and Junker said that responsive information had been given to the Board, but the Union representative explained that the Board and the Union aren't the same thing, and that the Union didn't have what it had asked for. Filing 28 at 54-55. Ziegelheim and Junker left, claiming it would take 4 or 5 days to recompile the information. Filing 28 at 55. Ziegelheim returned about 5 hours later with two manila envelopes with information he said was for about 50 employees, and said the rest of the information would be provided the next week. Filing 28 at 56. The meeting was adjourned for the day without any actual bargaining. *See* filing 28 at 56.

The Union and Noah's Ark met again on July 30, and the Union was given another manila envelope represented to contain information for another 50 workers. Filing 28 at 60. Noah's Ark then gave the Union a copy of the 2013 collective bargaining agreement with notes on it indicating the sections Noah's Ark wanted to remove. Filing 28 at 60. Among other things, Noah's Ark proposed to remove sections of the CBA relating to Union membership, grievances, injuries on the job, and safety. Filing 28 at 60-61, 67-69. Noah's Ark also proposed to take away extra vacation days for workers with seniority, and eliminate the provisions for funeral leave, jury duty, hospitalization, and vacation. Filing 28 at 61, 70-72. And Noah's Ark proposed to remove the section of the CBA providing for rates of pay, but not to replace it. Filing 28 at 61-62, 72-73. The parties discussed these issues and broke to caucus until 3 p.m., but Ziegelheim didn't return after the break. Filing 28 at 62. The Union's

representatives went through the Union's proposal and proposed some modifications, but Junker had no response. Filing 28 at 62-63.

When Noah's Ark and the Union met again on August 6, Noah's Ark presented the Union with a 3- to 4-inch stack of paper and represented it as the remaining information the Union had requested. Filing 28 at 63. The Union brought up the modifications it had suggested to its proposed agreement, but Ziegelheim cut off the discussion, informing the Union that Noah's Ark didn't plan to go back and make any changes—that the Union had been presented with Noah's Ark's "best and final proposal" on which Noah's Ark did not intend to negotiate. Filing 28 at 63. After the parties caucused, Ziegelheim repeated that he was unwilling to negotiate on Noah's Ark's offer. Filing 28 at 63.

In the meantime, the Union had been attempting to conduct make-up orientation sessions for workers hired since the Union's representative had been barred from Noah's Ark's facility in June 2017. Filing 28 at 82. Those efforts were frustrated by Noah's Ark. *See* filing 28 at 82-87. For instance, on August 1, after the Union's representative finished explaining the Union's costs and benefits to one of the workers, Noah's Ark's plant manager told the worker that grievances should instead be taken to a Noah's Ark "employee committee" that, the plant manager explained, "doesn't cost you anything." Filing 28 at 83. Similarly, during the next session, the plant manager followed the Union's representative by advocating for the "employee committee" that, he said, "doesn't cost you $271 a year in union dues. We don't charge nothing." Filing 28 at 84; *see* filing 28 at 86. On another occasion, the plant manager followed up the Union's presentation by explaining that Nebraska is a right-to-work state *and* that Noah's Ark had just given employees a raise of $2 to $4 per hour. Filing 28 at 191.

Based on the Board's evidence of the foregoing, the Court entered an order to show cause on September 18, directing Noah's Ark to show cause why

it should not be held in contempt of the Court's injunction. Filing 30. In response, Noah's Ark provided evidence that on <u>September 26</u>—over a week <u>after</u> the Court's order to show cause—it had finally provided the Union with information responsive to the Union's November 2017 request. Filing 31-1. Noah's Ark also provided the Court with an email chain between its counsel and the Union's counsel, in which counsel for Noah's Ark denied some of the claims leveled by the Union against Noah's Ark with respect to Union orientation sessions. Filing 31-2.

STANDARD OF REVIEW

A party commits contempt when he violates a definite and specific order of the Court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order. *Reed*, 888 F.3d at 936. And a party seeking a civil contempt order bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order. *Acosta v. La Piedad Corp.*, 894 F.3d 947, 951 (8th Cir. 2018); *Chicago Truck Drivers Union Pension Fund v. Brotherhood Labor Leasing,* 207 F.3d 500, 505 (8th Cir. 2000); *see Reed*, 888 F.3d at 936.[3]

Civil contempt is a severe remedy, and shouldn't be resorted to where there's a fair ground of doubt as to the wrongfulness of the alleged contemnor's conduct. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019). But "one of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject." *Chicago Truck Drivers*, 207 F.3d at 504. Accordingly, a civil contempt order is appropriate when a preliminary injunction has been violated

---

[3] If the moving party satisfies its initial burden, the burden shifts to the alleged contemnor to show inability to comply. *Id*. But Noah's Ark hasn't suggested it wasn't able to comply with the Court's order. *See* filing 32.

by a party subject to it. *See id.* at 505. And a party's subjective belief that he was complying with an order ordinarily will not insulate him from civil contempt if his belief was objectively unreasonable. *Taggart*, 139 S. Ct. at 1802.

FINDINGS OF CONTEMPT

The Board's motion for contempt (filing 26) identifies five ways in which Noah's Ark is allegedly in contempt. The Court finds that each was proven by clear and convincing evidence.

*Failure to Provide Information*

To begin with, the Board accuses Noah's Ark of failing to timely provide information requested by the Union nearly 2 years ago, and which the Court ordered to be provided on or before May 17. Filing 26 at 6. Noah's Ark's only response to that accusation actually proves the charge: Noah's Ark points to its September 26, 2019 letter to the Union's counsel allegedly providing the information. Filing 32 at 1.

It's self-evident that providing information on September 26, 2019 doesn't prove that Noah's Ark complied with the Court's May 10 order directing Noah's Ark to provide the information before May 17. Rather, pointing to the September 26 letter amounts to confessing Noah's Ark's contempt for the Court's May 10 order. That, if nothing else, is sufficient to warrant compensatory relief—the Board was forced to resort to a contempt motion and obtain an order to show cause to force Noah's Ark to comply with the Court's injunction, and the Board will be awarded costs and expenses to compensate it for that, in an amount to be proven by the Board's evidence.[4]

---

[4] And that all assumes that Noah's Ark has, at long last, provided the Union with the information it asked for. But Noah's Ark has provided information to the Union before, and it wasn't complete. And the actual data provided this time wasn't shown to the Court for

*Failure to Rescind Unilateral Changes*

The Board charges Noah's Ark with failing to rescind unilateral changes it had made to wages and to the Union's privileges in the facility. Filing 26 at 6. When asked about its compliance by the Board, Noah's Ark claimed that the Union hadn't asked for any wage increase to be rescinded, and denied making unilateral changes to the Union's facility access. Filing 28 at 131.

The assertion that the Union hadn't asked for unilateral wage increases to be rescinded is not accurate. The Court specifically discussed unilateral wage increases in its May 10 order, explaining why they were unlawful. Filing 21 at 21-22. The remedy afforded was to order Noah's Ark to, "[a]t the Union's election, rescind any or all of the unlawful unilateral changes to the employees' terms and conditions of employment[.]" Filing 21 at 29. And on the next business day after the Court's order, the Union asked Noah's Ark to "rescind any or all of the unlawful unilateral changes to the employees' terms and conditions of employment[.]" Filing 28 at 36. There was absolutely no doubt that unilateral wage changes were included. Nor has Noah's Ark responded to the actual evidence, in the form of an affidavit from the Union's business agent, that changes were made to the Union's access to the facility. Filing 28 at 86.

*Failure to Bargain in Good Faith*

Next, the Board accuses Noah's Ark of ongoing failure to negotiate with the Union in good faith. Filing 26 at 7. Noah's Ark simply claims that offering dates to the Union and sending Ziegelheim to the bargaining sessions was sufficient. Filing 32 at 2. It wasn't. Noah's Ark was plainly engaged in the same

---

verification. So, the Court will not be satisfied that Noah's Ark has *actually* complied with the Union's request and the Court's order until the Union assents or Noah's Ark affirmatively proves its compliance. *See Taggart*, 139 S. Ct. at 1802 (a party's record of persistent contumacy justifies placing the burden of uncertainty on the party who violated the order).

sort of "surface bargaining" that led to this injunction in the first place, and if anything it was less subtle.

To start with, the Court isn't convinced that Noah's Ark just happened to coincidentally offer dates for bargaining sessions on which Noah's Ark knew that Union officials would have other obligations. While not in itself violative, that sort of petty gamesmanship is illustrative of Noah's Ark's intent to frustrate the bargaining process. Similarly, waiting until June was effectively over to respond to the Union's offer to meet on any other dates in June demonstrates how non-committed Noah's Ark was to bargaining.

And of course, on the substance of negotiation between Noah's Ark and the Union, Noah's Ark has failed to counter any of the Board's evidence that the "bargaining" was a sham—and the Court concludes, for substantially the same reasons it did before, that Noah's Ark is engaged in a course of "surface bargaining" that the NLRA doesn't permit. *See* filing 21 at 22-24. Noah's Ark either doesn't understand the requirements of the NLRA or doesn't think they're meaningful. In sum, it's evident to the Court that Noah's Ark—and specifically, CEO Ziegelheim—*just doesn't get it*. The Court intends, however, to make sure he understands and complies in the future.

*Direct Dealing*

The Board argues that Noah's Ark's interference with the Union's orientation sessions violated the Court's proscription on direct dealing with workers regarding terms and conditions of employment. Filing 26 at 8. Noah's Ark simply denies that, supported by its own previous denials. Filing 32 at 2. In other words, Noah's Ark doesn't present any evidence to contradict the accounts of Union representatives regarding the behavior of the Noah's Ark plant manager during Union orientation meetings.

That said, the Court isn't entirely persuaded by the Board's classification of that conduct as "[d]irectly deal[ing] with employees regarding terms and conditions of employment." *See* filing 21 at 28. It's not totally unrelated, though—it's fair to characterize Noah's Ark as *promising* to directly deal with employees regarding terms and conditions of employment, should grievances arise. And it's *certainly* fair to characterize that conduct as violating other proscriptions imposed by the Court's order—in particular, the proscription on "[e]ngag[ing] in conduct intended to undermine the Union's bargaining representative status[.]" Filing 21 at 28.

It's hard to imagine conduct more clearly intended to undermine the Union than invading the Union's orientation session and then essentially telling employees that they didn't need to join the Union because Noah's Ark would provide them the same protections without charging dues. Now, in another context, the evidence *might* be construed to show an employer simply informing employees of their legal rights in a right-to-work state. But in *this* context, the evidence clearly falls into the pattern established by Noah's Ark's other unlawful anti-union activity. And it was contemptuous.

*Failure to File a Satisfactory Affidavit of Compliance*

Finally, the Board asserts that the affidavit from Noah's Ark's that was filed on May 31, 2019 was unsatisfactory. Filing 26 at 9. Specifically, the Board argues that the affidavit, which was meant to set forth Noah's Ark's compliance with the Court's injunction, is "misleading and deficient." Filing 27 at 23. Although this issue is less significant than Noah's Ark's *actual* failure to comply with the Court's injunction, the Court agrees with the Board on this point as well.

The Court's injunction ordered Noah's Ark, on or before May 31, to file "a sworn affidavit from a responsible official of Noah's Ark setting forth with

specificity the manner in which it has complied with this order. . . ." Filing 21 at 30. The affidavit that was filed came from the plant manager. Filing 22-1. In pertinent part, the plant manager averred that he had been "directed by" Ziegelheim to rescind unilateral changes to the workers' terms and conditions of employment—but he did not aver, precisely, that he had actually *done* so. Filing 22-1 at 2. Similarly, the affidavit averred that Noah's Ark's HR manager had "been directed" to provide information to the Union—not, precisely, that she had actually done so. Filing 22-1 at 2.

In sum, while the Court could have overlooked the deficiencies in the affidavit had Noah's Ark actually abided by the Court's order, the Court is less inclined to look past such dodges in the face of evidence that Noah's Ark didn't conduct itself as it was ordered to do. And while this issue is secondary to Noah's Ark's actual noncompliance, it is not irrelevant, because it means that Noah's Ark has not only violated the Court's injunction—Noah's Ark has also not been completely candid with the Court.

## REMEDIAL MEASURES

For the foregoing reasons, the Court finds clear and convincing evidence that Noah's Ark is in contempt of the Court's May 10 injunction (filing 21) in each of the ways asserted by the Board. What remains is to fashion an appropriate response.

Civil contempt may be employed either to coerce the contemnor into compliance with a court order or to compensate the complainant for losses sustained, or both. *Chicago Truck Drivers*, 207 F.3d at 505. The paradigmatic coercive civil contempt sanction involves confining a contemnor indefinitely until he complies with a command. *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 826-28 (1994). Similarly, a contempt fine is considered

civil and remedial if it either coerces the defendant into compliance with the court's order or compensates the complainant for losses sustained. *Id.* at 829.

Accordingly, in imposing a sanction, a court should specify whether monetary sanctions are compensatory or coercive in nature, and explain the basis for whatever amount is ordered. *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1225 (8th Cir. 2006). In awarding a sanction for noncompliance,

> [t]he court should determine the amount of the sanction only after considering the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about the result desired, and the amount of the contemnor's financial resources and the consequent seriousness of the burden to that particular party.

*Id.* at 1224. And a party's good faith, even where it does not bar civil contempt, may help determine an appropriate sanction. *Taggart*, 139 S. Ct. at 1802.

When a sanction is designed to coerce a recalcitrant party to comply, the sanction should be payable to the court, rather than to the opposing party. *Chaganti*, 470 F.3d at 1224. Where compensation is intended, however, a fine is imposed payable to complainant. *Chicago Truck Drivers*, 207 F.3d at 505. Compensatory damages "must of course be based on evidence of complainant's actual loss." *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947). For instance, an award of reasonable attorney's fees and expenses incurred in seeking to enforce the decree is one form of compensatory relief that is well within a district court's remedial discretion in civil contempt proceedings. *Jake's, Ltd., Inc. v. City of Coates*, 356 F.3d 896, 900 (8th Cir. 2004).

As mentioned above, the Court certainly intends to award compensation to the Board for its costs associated with prosecuting this contempt. *See*

*Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 786 (7th Cir. 1981) (it is "well settled" that compensatory awards for contempt may be made to governmental agencies); *accord United States v. Abodeely*, 564 F. Supp. 327, 329 (N.D. Iowa 1983); *cf. Jake's, Ltd,* 356 F.3d at 900. Evidence establishing those costs will, of course, be required from the Board.[5]

Ensuring Noah's Ark's compliance with the Court's orders is another matter. The Court must determine what coercive sanction will suffice, and the Court must specifically identify those actions necessary to bring the contemnor into compliance. *See Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 293 F.3d 409, 418 (8th Cir. 2002). Those are not easy questions. . . but, it's obviously not sufficient to simply order Noah's Ark to do what it should. The Court tried that, and it didn't work. Nor is the Court able to rely on Noah's Ark at this point, given past practices. So, the Court's next order will have more teeth. But the Court will require more input from the parties on precisely how sharp they should be.

Accordingly, the Court will set this case for argument regarding the sanctions to be imposed and an appropriate remediation plan. Counsel and representatives of the parties are required to appear. In particular, Noah's Ark CEO Fischel Ziegelheim is ordered to be personally present in the courtroom to answer for Noah's Ark's contempt. *See In re Medlock,* 406 F.3d 1066, 1071-73 (8th Cir. 2005). Failure to physically appear at the time and place specified may result in the issuance of a bench warrant for his arrest by the U.S. Marshal's Service. Counsel and representatives for the Union are also encouraged (but not required) to appear. The parties should be prepared to

---

[5] The Court has also considered whether a compensatory award could be made to the Union, but it appears not, because the Union is not a party. *See Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4,* 721 F.3d 1122, 1131 (9th Cir. 2013), *Roe v. Operation Rescue,* 919 F.2d 857, 872-74 (3d Cir. 1990).

advise the Court on whether the material delivered to the Union on September 26, 2019 actually brought Noah's Ark into compliance with that provision of the Court's injunction by providing the Union with the information it had initially requested in November 2017. Counsel should also be prepared to address (1) what coercive sanction is appropriate, and (2) how Noah's Ark should be required to purge its remaining contempt.[6]

The Court has reviewed the Board's Motion to Modify Injunctive Order ([filing 34](filing 34)) in light of the administrative law judge's decision ([filing 35](filing 35)) in the underlying Board proceedings. The Court will also take up that motion at the scheduled argument.

IT IS ORDERED:

1. The Board's Motion for Adjudication in Civil Contempt ([filing 26](filing 26)) is granted.

2. Noah's Ark is found in contempt of the Court's May 10, 2019 Memorandum and Order ([filing 21](filing 21)).

3. Argument on an appropriate sanction and purge plan for Noah's Ark's contempt is set before the undersigned on October 25, 2019 at 1:30 p.m. in Courtroom 1, Robert V.

---

[6] Of course, nothing precludes counsel for the Board, Union, and Noah's Ark from discussing the matter among themselves before coming to court. Noah's Ark might learn the value of bargaining in good faith with the Union by coming to some sort of agreement on a plan for remediation. . . before finding out another way what the Court might have in mind.

Denney Federal Building, 100 Centennial Mall North, Lincoln, Nebraska.

4. Noah's Ark CEO Fischel Ziegelheim is ordered to be personally present in the courtroom to answer for Noah's Ark's contempt.

Dated this 17th day of October, 2019.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
Chief United States District Judge